1

1          UNITED STATES DISTRICT COURT
               DISTRICT OF COLORADO
2

3   UNITED STATES OF AMERICA,     .   Case No. 20-mj-00148-GPG-1
                                  .
4           Plaintiff,            .
                                  .
5   vs.                           .   Wayne Aspinall US Courthouse
                                  .   400 Rood Avenue
6   BEAU AARON HOWARTH,           .   Grand Junction, CO  81501
                                  .
7           Defendant.            .
                                  .   September 28, 2020
8   . . . . . . . . . . . . . . . .   4:24 p.m.

9

        **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
10       **GORDON P. GALLAGHER, UNITED STATES MAGISTRATE JUDGE**

11

    APPEARANCES:
12

13   For the Plaintiff:          U.S. Attorney's Office
                                 By:  Peter G. Hautzinger
14                               205 North 4th Street
                                 Suite 400
15                               Grand Junction, CO  81501
                                 (970) 241-3843

16   For the Defendant:          Federal Public Defender
                                 By:  David A. Kraut
17                               633 17th Street
                                 Suite 1000
18                               Denver, CO  80202
                                 (303) 294-7002
19
     Court Recorder:             Clerk's Office
20                               U.S. District Court
                                 400 Rood Avenue
21                               Grand Junction, CO  81501

22   Transcription Service:      AB Litigation Services
                                 216 16th Street, Suite 600
23                               Denver, CO  80202
                                 (303) 296-0017

24
    Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

1                    (Time noted:  4:24 p.m.)

2              THE COURT:  All right, good afternoon, everybody.

3    Give me just a moment to get the computer running.

4         (Pause)

5              THE COURT:  All right.  We are here this afternoon

6    in 20-mj-148.  This is the United States versus Mr. Beau

7    Aaron Howarth.

8              And let me start, Mr. Howarth, and make sure that

9    you can both see and hear me.

10             MR. HOWARTH:  Yes, Your Honor.

11             THE COURT:  All right.  Mr. Howarth is appearing

12   from the Mesa County Detention Facility.  He is represented

13   by Mr. Harris.  Mr. Harris, can you see and hear me?

14        (No response)

15             THE COURT:  Oh, I'm sorry.

16             MR. KRAUT:  Good afternoon, Your Honor.

17             THE COURT:  Mr. Kraut?

18             MR. KRAUT:  Yes.  Good afternoon.

19             THE COURT:  All right.

20             MR. KRAUT:  Nice to meet you, Your Honor.  David

21   Kraut appearing for Mr. Howarth.

22             THE COURT:  All right.  Good afternoon.

23             MR. KRAUT:  Mr. Harris just handled the initial

24   event.

25             THE COURT:  All right, thank you.  Sorry, I didn't

3

1  look -- the picture was small, and I didn't look past the

2  first entry.

3           So, good afternoon, and nice to meet you, Mr.

4  Kraut.

5           And Mr. Hautzinger is here for the Government.

6  Can you see and hear us, sir?

7           MR. HAUTZINGER:  Yes, I can, Your Honor.  Can you

8  hear me?

9           THE COURT:  We can.  Thank you very much.

10           MR. HAUTZINGER:  I've been having microphone

11  problems.

12           THE COURT:  No, we hear you perfectly.  So this

13  matter proceeds pursuant to the CARES Act and General Order

14  20-4 and continuations thereof, because of the continuing

15  Coronavirus pandemic.  Therefore, we are proceeding digitally

16  today.

17           And I have received and reviewed the pre-trial

18  services report.  Have you received and reviewed it, Mr.

19  Hautzinger?

20           MR. HAUTZINGER:  Yes, Your Honor, I have.

21           THE COURT:  All right.  And, Mr. Hautzinger, what

22  -- without -- I'll go into argument here in a moment, if

23  we're going to have it, but what is the Government's position

24  in terms of whether the Government is still seeking

25  detention?

1        MR. HAUTZINGER:  The Government is still seeking

2   detention, Your Honor.

3        THE COURT:  Okay.  Mr. Kraut, have you received,

4   reviewed the report, and had an opportunity to review it with

5   your client?

6        MR. KRAUT:  I have personally received it and

7   reviewed it, but I have not had the chance to speak to Mr.

8   Howarth about it.  And I don't believe it has been

9   transmitted to him in the Mesa County Jail.

10        THE COURT:  Okay.  Would you like an opportunity

11   before we start the hearing to talk with Mr. Howarth about

12   it?

13        MR. KRAUT:  I would, if there's a way -- if they

14   have a phone there, if there's a way that we could --

15        THE COURT:  We can either do that, or Mr.

16   Hautzinger and I can both drop off -- well, Mr. Hautzinger

17   generally drops off.  Ms. Barnes and I leave the room.

18        Let me ask the detention facility.  Is it easier

19   for you if we keep the VTC connection going and do it through

20   this, or would you rather we do a phone call?

21        DETENTION FACILITY:  Let's keep the VTC going, and

22   we'll do it by phone call.  I'll just mute everybody out and

23   step out of the room myself, because the phone is sitting

24   right here five feet from him.

25        THE COURT:  Okay.  So we'll just keep that going.

5

1   Mr. Kraut, do you think about eight minutes is enough time?

2   And just so we aren't reading lips or anything, we'll step in

3   at about that time.  Does that work?

4             MR. KRAUT:  That sounds perfect.

5             THE COURT:  All right.

6             MR. KRAUT:  Thank you very much.

7             THE COURT:  We'll come back at about 4:35, then.

8   Thank you.

9             DETENTION FACILITY:  Mr. Kraut, if you'll call

10  (970) 244-3374.  That's the direct line here.

11            MR. KRAUT:  Okay.

12            DETENTION FACILITY:  I'll answer it and make sure

13  the connection is good, and then I'll step out of the room.

14            MR. KRAUT:  Okay, thank you so much.

15            (Recess from 4:28 p.m. until 4:37 p.m.)

16            THE COURT:  All right, we are back on the record.

17  All of the same parties are here.

18            And I should mention, and I'm remiss, Mr. Cohen is

19  here by phone.  Can you hear us, Mr. Cohen?

20            MR. COHEN:  Yes, Your Honor, I can hear you.

21            THE COURT:  All right, thank you.  All right, Mr.

22  Kraut, have you had the opportunity you need to review the

23  pre-trial services report with your client?

24            MR. KRAUT:  I sure have.  Thank you very much for

25  that opportunity, Your Honor.

1          THE COURT:  Certainly.  And, Mr. Kraut, are we

2   going to proceed to a detention hearing today?

3          MR. KRAUT:  Yes, please.

4          THE COURT:  All right.  Mr. Hautzinger, your

5   presentation, please?

6          MR. HAUTZINGER:  Your Honor, I'm opposing

7   probation's recommendation of release on conditions, with no

8   supervision, as well, for a number of reasons.

9          First and foremost is the nature of the offense

10  alleged here.  I'm in my -- I don't want to lose track, my

11  28th year -- no, 32nd year as a Colorado prosecutor.  And I

12  have never seen these quantities in any case before.  Twelve

13  kilos of heroin, and twenty thousand Fentanyl pills.  That's

14  enough Fentanyl to kill every resident of Mesa County.

15         And I think the quantities involved here are so

16  huge and so frankly terrifying that detention is really the

17  only position that the Government could responsibly take

18  here.

19         I'm also concerned about the recommendation of no

20  supervision, given that the Defendant declined to answer

21  questions pertaining to his mental health history, offered

22  limited information pertaining to his substance use history.

23  I just find that troubling.

24         Finally, Your Honor, I just recently received an

25  email from one of the case agents who had been listening to

1  jail calls that the Defendant has been involved with.

2          First off, I don't know if this is in the

3  complaint affidavit, but the Court should be aware of it,

4  that a receipt for sunglasses -- purchase of sunglasses with

5  the name "Beau" written on it next to the customer line was

6  found in the side pocket of the duffle bag that the drugs

7  were found in.

8          The Defendant had a jail call where his wife,

9  Ariel Guerrero (ph), on September 22nd at about 7:53 p.m.

10  Ariel stated that she spoke with the Defendant's uncle by

11  stating "Your uncle reached out to me.  He's been freaking

12  out.  He's getting a lawyer."

13          Ariel explained that she had been speaking with

14  the uncle.  It should be noted that Howarth -- the

15  Defendant's uncle was blowing up his phone.  This is the

16  agent writing here.  "It should be noted that Howarth's uncle

17  was blowing up his phone while he was in custody.  We allowed

18  Howarth to call Ariel to give her a head's up that he had

19  been arrested, and uncle called Facetime-WhatsApp messaged

20  Howarth repeatedly during the phone call with Ariel.  It was

21  at excessive amounts, and Howarth was quick to reject the

22  calls."

23          In another jail call shortly after that, on the

24  22nd at about 8:06 p.m., the Defendant called (931) 272-7073,

25  believed to be Dillon Freese.  Howarth stated:  "You know

1  what you do."  And Freese responded with:  "Yeah."

2          Howarth then stated "bad but worse."  Freese asked

3  Howarth what he was doing, and Howarth responded with

4  "transporting."

5          In another jail call on the 23rd, at about 8:12

6  p.m., the Defendant again called his wife, Ariel Guerrero.

7  They discussed retaining an attorney for $10,000.00 up-front.

8  Ariel said she was going to call more lawyers.

9          And then the Defendant told Ariel to write some

10  numbers down.  He stated "12K."  Ariel responded "12K."

11          Howarth then stated "20K."  And Ariel responded

12  with "20K, okay."

13          Howarth read through the paperwork of his charges,

14  and explained "those were the weight."  Howarth stated

15  "there's apparently three packages with numbers on them, and

16  if those numbers were correct, if the numbers in my book are

17  correct, because honestly I don't really know.  Two of them

18  were labeled 5, I guess, and one was labeled 10,000 for

19  pills."

20          I would submit, Your Honor, that those jail calls

21  reflect guilt and an understanding that he was involved in

22  distributing and transporting, again, these massive numbers

23  of heroin and Fentanyl.

24          And I think that goes to the strength of the case,

25  which is a fact for the Court to take into account.

1          For all of those reasons, the Government persists

2    in asking for detention.

3          THE COURT:  Thank you, Mr. Hautzinger.  Mr. Kraut,

4    please?

5          MR. KRAUT:  Thank you very much, Your Honor.  We

6    are asking for Mr. Howarth to be released to live with his

7    parents in Henderson, Colorado, as recommended by pre-trial

8    services.

9          Mr. Howarth has no criminal history.  He is a

10   life-long Colorado resident, with the exception of his

11   military service, which brought him to Alabama and briefly

12   overseas and back.

13         He does have employment waiting for him, which is

14   in addition and a little bit different than what the pre-

15   trial report indicates on that topic.  We had our

16   investigator make a call today.

17         The reason for the change in potential employment

18   was that at the time of the pre-trial interview, Mr. Howarth

19   reported working for Uber and planned to continue working for

20   Uber at the least.

21         After that interview, he and I were able to speak,

22   and I had -- my belief, based on my experience, that Uber is

23   unlikely to let him continue driving with a pending Federal

24   felony matter.

25         So based on that, I got some additional

1  information that wasn't initially shared with the pre-trial

2  officer, so that's why there's this -- this new potential

3  employer.

4          We followed up on that, and determined that, yes,

5  Mr. Howarth could work for Rush Management doing landscaping

6  until the snowy season begins, and then go to snow removal

7  during the winter.  And Mr. Howarth would be working full-

8  time, and we'll be happy and able -- physically able to do

9  that work.

10          Mr. Howarth's mother, Ms. Padilla, I believe is

11  listening in.  And depending on the number she gives to

12  access today's hearing, she may be able to respond to the

13  Court if the Court has questions for her.

14          But she has indicated to me that she is willing

15  and able to be a third party custodian.  She confirmed that,

16  which is reflected in the pre-trial report, as well.

17          I can tell the Court that in my conversation with

18  Ms. Padilla, I described for her my understanding of what

19  being a third party custodian entails, which means

20  essentially serving as the eyes and ears of the Court while

21  Mr. Howarth was on bond, and that she would need to report if

22  he violated any condition of his release and ensure that he

23  attended all future Court appearances, whether they be remote

24  or in-person.

25          And she very quickly said that would be no problem

1  for her, and she was confident in her ability to do that

2  successfully.

3          There is no indication in the complaint that Mr.

4  Howarth possessed any weapons or used any violence, or

5  threatened any violence, or attempted to flee.  Everything in

6  the complaint suggests that he yielded to authorities when

7  they pulled him over, and was non-threatening and cooperative

8  throughout the interaction, which, of course, is generally

9  consistent with Mr. Howarth's military training and respect

10 for authorities in general, which is long-standing for him.

11         I do recognize that pre-trial recommends no

12 supervision, and I understand Mr. Hautzinger's position

13 regarding some degree of surprise at that particular

14 recommendation.  If the Court would be more comfortable

15 releasing Mr. Howarth with some measure of supervision in the

16 community, I have spoken with Mr. Howarth about that, as well

17 as with his mother, and they are both prepared for that and

18 certainly will comply.

19         My suggestions regarding supervision would include

20 at the Court's discretion either a GPS ankle monitor, or a

21 radio frequency home confinement ankle monitor.  A home

22 confinement monitor would alert probation every time Mr.

23 Howarth was not in his home.  That would be essentially a

24 beacon permanently in the house that will link with the ankle

25 monitor.

1        He would receive approved times each day that he
2    could leave for either work or medical appointments or other
3    approved appointments.  And if he was ever outside of his
4    home other than those approved times, there would be an alert
5    immediately to probation.
6        Alternatively, a GPS will alert probation to his
7    whereabouts 24/7.
8        So either way, Mr. Howarth is reading and willing
9    to be monitored at a very strict level.
10       In addition to that, if the Court feels that based
11   on the nature of the charges here, some degree of substance
12   monitoring is necessary, he is more than happy to take UAs at
13   the discretion of pre-trial services.
14       And I think that the recommendation by me for him
15   to not discuss substance abuse in detail during the pre-trial
16   interview was really a product of the nature of the charges,
17   and sort of industry standard in these types of cases.  And I
18   hope that the Court will not use his adherence to his
19   lawyer's advice on that topic against him.
20       Finally, with respect to the statements asserted
21   by Mr. Hautzinger made during these jail calls, I haven't had
22   the chance to receive those yet.  I'm sure I will at some
23   point in the case.
24       With regard to anything about, you know, specific
25   quantities that Mr. Howarth is mentioning, I would note that

1  at the time of those calls, I believe he had been provided a

2  copy of his complaint, and the complaint contains those

3  alleged quantities, as the Court has reviewed.

4          So it is certainly possible that rather than

5  essentially confessing, as the Government has argued, he was

6  reporting to a loved one what he's being accused of.

7          That said, I'm really not in a position to get

8  into the weeds arguing what these jail calls meant, since I

9  have not personally reviewed them.

10          Mr. Howarth is a young man with long-standing ties

11  to the community.  A solid family waiting to welcome him back

12  into their home and supervise him while this case is pending.

13          And no criminal history at all to speak of.

14          And so under these circumstances, we do not

15  believe that Mr. Howarth is a flight risk or presents a

16  danger to the community that cannot be managed effectively

17  through conditions of supervision.

18          I recognize it is a presumption case, but I

19  believe that by the information contained in the pre-trial

20  report and the investigator's memorandum regarding his

21  employment opportunity with Rush Management, and potentially

22  testimony or statements from Mr. Howarth's mother under this

23  unique set of circumstances, that I would submit the defenses

24  overcome the presumption and that we have established that

25  there are conditions of release that can assure his presence

1    in Court and safety in the community.

2                That's all I have, Your Honor.

3                THE COURT:  Mr. Kraut, I do have Defendant's

4    exhibit.  Do you want me to mark that as exhibit A?

5                MR. KRAUT:  Yes, Your Honor.  We would move the

6    Court to mark that and we would move to admit that for the

7    purposes of this hearing.

8                THE COURT:  All right.  Mr. Hautzinger, any

9    objection to that?

10               MR. HAUTZINGER:  No objection, Your Honor.

11               THE COURT:  All right.  Defendant's A is admitted.

12               And, Mr. Kraut, did you want to have your client's

13   mother go ahead and make a statement, or just listen in?

14               MR. KRAUT:  If the Court has questions for her, I

15   wanted her to be available.

16               THE COURT:  Sure.

17               MR. KRAUT:  But I don't know that she has anything

18   specific to add to what I've already stated.

19               THE COURT:  All right.

20               MR. KRAUT:  I also am not certain that she can

21   address the Court.

22               Ms. Padilla, if you can hear me and un-mute

23   yourself and maybe introduce yourself to the Court, just so

24   we can tell if you can hear us.

25               MS. PADILLA:  Hello, Your Honor.  My name is Naomi

1   Padilla, and I'm Beau's mom.

2             THE COURT:  All right.

3             MR. KRAUT:  Excellent.  Thank you very much, Ms.

4   Padilla.

5             THE COURT:  Good afternoon, Ms. Padilla.  All

6   right.  Did you have anything that you wanted to tell me, Ms.

7   Padilla?

8             MS. PADILLA:  Not other than what I've already

9   provided to the attorney.  I do have specific questions, Your

10  Honor.

11            THE COURT:  Okay, thank you.  I don't have any

12  specific questions.

13            Mr. Hautzinger, I do have a question for you.  Has

14  anybody done a preliminary analysis of the street value of

15  the heroin and cocaine?  I'm sorry, heroin and Fentanyl pills

16  in this matter?

17            MR. HAUTZINGER:  I'm not aware of that, Your

18  Honor.

19            THE COURT:  Thank you.  All right.

20            MR. KRAUT:  Your Honor, if I may just --

21            THE COURT:  Certainly.  Go ahead, Mr. Kraut.

22            MR. KRAUT:  I'm sorry, Your Honor.

23            THE COURT:  Yes?

24            MR. KRAUT:  I just wanted to ask Ms. Padilla just

25  real briefly, really for the benefit of the record.  Ms.

1  Padilla, if you can hear me, could you just let the Court

2  know whether my description of your household and your

3  ability to serve as a third party custodian, if all of that

4  was accurate?

5          MS. PADILLA:  Yes, sir, it was accurate.

6          MR. KRAUT:  Okay.

7          THE COURT:  All right.

8          MR. KRAUT:  Thank you very much, Ms. Padilla.

9  Thank you, Your Honor.

10          THE COURT:  Thank you.  Mr. Hautzinger, any

11  rebuttal?

12          MR. HAUTZINGER:  Just one point, Your Honor.

13  While Mr. Kraut is certainly correct that the weights were

14  reflected in the complaint, there wasn't anything in the

15  complaint about the Defendant's book and the numbers having

16  been written down in the book being correct.  I think that's

17  a significant fact.

18          Nothing further.

19          THE COURT:  Thank you.  All right.  First,

20  Defendant's exhibit A is admitted.

21          And as I have said before, and will probably

22  continue saying, pre-trial decisions are -- pre-trial

23  incarceration decisions are some of the most difficult

24  decisions that the Court is called upon to make.

25          Here, first, based on purely the nature of the

1   charge that is charged in this matter by way of complaint,

2   Mr. Howarth has already been advised, but I think it bears

3   repeating for the record, that this is a charge that carries

4   no less than ten years and no more than life imprisonment.

5           Because of that, Congress has specifically

6   determined that there is a presumption of detention.

7   Therefore, it is presumed that there is no condition or

8   combination of conditions that will ensure the safety of the

9   community and the appearance of the Defendant in Court.

10          Of course, that presumption can be overborne

11  before -- and that is for any charge of that ilk.  Here, it's

12  for a charge for possession with intent to distribute more

13  than one kilogram of heroin.

14          Of course, there is a sliding scale even within

15  charges themselves, greater and lower, depending upon the

16  evidence, the weight of the evidence that the Court can

17  considered.

18          And all of this is in keeping in mind that the

19  Defendant is, of course, presumed innocent.

20          But I have found, at least for purposes of the

21  complaint, that there is probable cause to support the

22  charge.  Otherwise, the warrant would not have been issued.

23          Here, Mr. Howarth is a young man who comes before

24  the Court with no criminal history of any great note.  He has

25  a minor traffic matter from Adams County that had an arrest

1    warrant on it, and then one drug use charge that indicated no

2    prosecution out of the U.S. military.

3            Beyond that, he was honorably discharged after a

4    period of three years of service, and appears to have

5    substantial ties to Colorado, and to have work waiting for

6    him.

7            That is juxtaposed with the allegations here of an

8    absolutely enormous amount of drugs, starting with 12 kilos

9    of heroin, which is 12 times the amount of the minimum to get

10   to the presumption that Congress put in place, and then some

11   20,000 Fentanyl pills.

12           What the Statute doesn't do is give the Court any

13   kind of mathematical basis for figuring how much extra drugs

14   has to outweigh the good that somebody has done in their life

15   before the presumption is not overborne, and that's, of

16   course, left to the Court's judgment.

17           Here, as I said, the Defendant has no criminal

18   history.  However, it frankly defies common sense to think

19   that this is likely a first potential go at this for Mr.

20   Howarth.  Maybe it is, and this just happens to be the one-

21   off massive drug shipment of all time.  But that really

22   defies logic.

23           Drugs are a business.  Business people are

24   cautious.  They generally use people that they trust, and

25   they build that trust, usually, over a period of time based

 1   on performance.  And by the time somebody gets to the

 2   circumstance where they are allegedly transporting 12 kilos

 3   of heroin and 20,000 Fentanyl pills, we're in a circumstance

 4   where somebody, at least logically, would have been in that

 5   position before to build that trust with their business

 6   partners or supervisors.

 7          That is, at least to some extent, corroborated by

 8   the jail phone call having to do with a book, which generally

 9   has to do with potentially pay for jobs.  And here, based on

10   the information that the Court has been provided in the

11   context of the phone call, that appears to be what the

12   discussion was about in this context.

13          Given the strength of this case, the relationship

14   that appears to have occurred intermixing personal items of

15   the Defendant with these drugs, which would make it more

16   difficult at least to have the argument of lack of knowledge,

17   and that's something to be addressed at a trial, and the

18   massive amount of drugs, the Court cannot find that even Mr.

19   Howarth's lack of record and ties to Colorado overbear the

20   presumption.

21          I will not say that it isn't a close call, because

22   I think it is.  But given the significant amount of drugs,

23   both heroin and Fentanyl, both among the most deadly

24   substances out there, the phone calls from the jail, the

25   Court does not find that there is any condition or

1   combination of conditions, by a clear and convincing

2   standard, that will ensure the safety of the public, or by a

3   preponderance that will ensure the appearance of the

4   Defendant in Court.

5        I do remand you, Mr. Howarth, to the custody of

6   the United States Marshals Service pending further

7   proceedings in this matter, with no conditions of release.

8        I will issue a detention order mostly likely

9   tomorrow memorializing that for the record, although to the

10  extent that the defense determines that they want to object

11  to my order, that time period begins running immediately.

12       And, Mr. Hautzinger, where are we in terms of time

13  and next appearances based on Grand Jury -- I think we're

14  counting our 14 days from -- it looks like we were here on

15  the 23rd.

16       So if I'm calculating that correctly, October 7th

17  would be the date that we would need to have a preliminary

18  hearing, if the Government wasn't able to get to a Grand Jury

19  by that date.

20       (Pause)

21       THE COURT:  Let me have you start over, Mr.

22  Hautzinger.  We're seeing your lips move, but we're not

23  hearing you.

24       MR. HAUTZINGER:  I'll try it again.

25       THE COURT:  Okay.

1          MR. HAUTZINGER:  Can you hear me now?

2          THE COURT:  Now we hear you.  Thank you.

3          MR. HAUTZINGER:  I anticipate having an indictment

4    by close of business Friday.  So I suggest setting a return

5    for early next week.

6          THE COURT:  Okay.  So with that in mind, I can

7    offer you something as soon as Monday.  I think we'll

8    probably need to do it in the morning if it's Monday, so that

9    the jail has Monday afternoon for purposes of weekend

10   arrests.

11          How about 11:00 o'clock on the 5th, Monday?

12          MR. HAUTZINGER:  I defer to Mr. Kraut as to what

13   works best for him.

14          MR. KRAUT:  That will be fine for me, Your Honor.

15   Thank you.

16          THE COURT:  Okay.  How about for the detention

17   facility?

18          DETENTION FACILITY:  Your Honor, if we could do

19   10:00 o'clock, that would work better for our over all

20   schedule, if that works for everybody else.  If not, we'll

21   make it work.

22          THE COURT:  Sure.  We can do 10:00.  Does that

23   work, Mr. Hautzinger and Mr. Kraut?

24          MR. KRAUT:  Yes.

25          MR. HAUTZINGER:  I have a mandatory all-office

 1  call every Monday morning at 10:00 o'clock.

 2           THE COURT:  Okay.  How long do you --

 3           MR. HAUTZINGER:  Could we try --

 4           THE COURT:  Oh, go ahead.

 5           MR. HAUTZINGER:  How about 10:15?  Would that be

 6  okay for the facility?  It's usually a pretty brief call, but

 7  it --

 8           THE COURT:  Sure.  How does 10:15 work?

 9           DETENTION FACILITY:  We will do 10:15, Mr.

10  Hautzinger.

11           THE COURT:  Okay.  Mr. Kraut, 10:15 work for you?

12           MR. KRAUT:  Yes, that's fine for me.  Thank you.

13           THE COURT:  Okay.  We'll be back together at 10:15

14  for what is likely going to be arraignment, discovery, or, if

15  necessary, a setting of a preliminary hearing.

16           All right.  Anything further, Mr. Kraut, from your

17  perspective?

18           MR. KRAUT:  And that's setting for Monday the 5th

19  of October by video teleconference?

20           THE COURT:  Yes.

21           MR. KRAUT:  Okay.  Nothing further.  Thank you

22  very much.

23           THE COURT:  All right.  Mr. Hautzinger?

24           MR. HAUTZINGER:  Nothing further.  Thank you,

25  Judge.

1          THE COURT:  Okay, thank you.  Have a good

2   afternoon, everybody.

3          DETENTION FACILITY:  Thank you, Your Honor.

4          THE COURT:  Take care, everybody.  Thank you all.

5   Thank you, the detention facility.

6                    (Time noted:  5:03 p.m.)

7                         *  *  *  *  *

8                          <u>CERTIFICATE</u>

9       I, RANDEL RAISON, certify that the foregoing is a

10  correct transcript from the official electronic sound

11  recording of the proceedings in the above-entitled matter, to

12  the best of my ability.

13

14

15  _____          November 4, 2020

16  Randel Raison

17

18

19

20

21

22

23

24

25